## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| RICHARD E. SHREVES,<br><br>        Plaintiff,<br><br>vs.<br><br><br>MICHAEL FLETCHER,<br><br>        Defendant. | CV 18–97–H–DLC<br><br><br>ORDER |

Before the Court is Plaintiff Richard E. Shreves' Motion for New Trial. (Doc. 337.)  Mr. Shreves moves this Court for a new trial pursuant to Federal Rule of Civil Procedure Rule 59 "due to prejudice from security questions and presence in trial; Judge as advocate on behalf of Defendant and Warden witness; Extraneous Juror influence during deliberations; decision for adverse action on verdict form goes against the clear weight of the evidence; and inadequate jury instructions for the jury to determine the element related to adverse action amounting to retaliation."  (Doc. 338 at 1–2.)  Defendant opposes the motion, arguing that the issues Mr. Shreves raises should be addressed in the appeal Mr. Shreves has already filed.  (Doc. 344 at 1–2.)  The motion will be denied.

## Background

Plaintiff is a convicted and sentenced state prisoner residing at Montana State Prison.  (Doc. 145 at 5.)  The operative complaint alleged claims under 42 U.S.C. § 1983 against eighteen defendants, asserting retaliation in violation of the First Amendment, conspiracy to retaliate, and violation of Plaintiff's Fourteenth Amendment due process rights dating back to January 2015.  (*See generally id.*) Plaintiff alleged that the defendants unconstitutionally retaliated against him for filing grievances and litigation against them and unconstitutionally censored publications, restricted his access to published information, and violated his right to free exercise of religion and RLUIPA by removing books from the Montana State Prison library.  (Doc. 252 at 1–2.)  The Court granted summary judgment on all claims except for his First Amendment retaliation claim against the former warden of MSP, Michael Fletcher.  (*Id.* at 27–34.)  That claim proceeded to a jury trial on February 6, 2023.  On February 7, the seven-person jury returned a verdict in favor of Defendant, answering "No" to the following question on the verdict form: "Did the Defendant, Michael Fletcher, take an adverse action against the Plaintiff, Richard Shreves by threatening him, explicitly or implicitly, with the loss of privileges?"  (Doc. 335 at 1.)  Plaintiff timely filed the instant motion for a new trial on February 21, 2023.  (Doc. 337.)

2

## LEGAL STANDARD

Rule 59 of the Federal Rules of Civil Procedure permits a court to "grant a new trial . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]"  Fed. R. Civ. P. 59(a)(1)(A).  The Court is "thus bound by those grounds that have been historically recognized." *Zhang v. Am. Gem Seafoods, Inc.*, 339 F.3d 1020, 1035 (9th Cir. 2003).  "Historically recognized grounds include, but are not limited to, claims 'that the verdict is against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving.'"  *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (quoting *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940)).  The Ninth Circuit has held that "[t]he trial court may grant a new trial only if the verdict is contrary to the clear weight of the evidence, is based upon false or perjurious evidence, or to prevent a miscarriage of justice."  *Id.* (quoting *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 510 n.15 (9th Cir. 2000)).  Erroneous jury instructions are a permissible basis for a new trial.  *Murphy v. City of Long Beach*, 914 F.2d 183, 187 (9th Cir. 1990).

In considering a motion for a new trial, the Court "is not required to view the trial evidence in the light most favorable to the verdict.  Instead, the district court

can weigh the evidence and assess the credibility of the witnesses." *Experience Hendrix L.L.C. v. Hendrixlicensing.com Ltd.*, 762 F.3d 829, 842 (9th Cir. 2014).

DISCUSSION

Although Mr. Shreves has filed a notice of appeal, such notice becomes effective to appeal the judgment entered in this case upon entry of this order.  Fed. R. App. P. 4(a)(4).  Accordingly, the Court retains jurisdiction to resolve the motion.

**I.    Security measures during the trial were not prejudicial.**

Plaintiff argues that he suffered "overwhelming" and "inherent" prejudice based on the Court's comments to the jury during voir dire that jurors need not be afraid of Plaintiff; the presence of two uniformed MSP security officers in the courtroom, including one officer sitting directly behind him; and "everytime [sic] the plaintiff would stand, the officer would jump up like Shreves was about to do something dangerous or threatening."  (Doc. 338 at 3–4.)  Plaintiff argues that he later suffered additional, similar prejudice as a result of questioning of Fletcher by defense counsel "implying the dangerous nature of Shreves when asking about office supplies in the 9-6-17 meeting."  (*Id.* at 5; *see also id.* at 6 (arguing that Fletcher and the State of Montana made an "assertion of the constant and persistent threat Shreves posed to the Court, Fletcher, Jurors, and everyone else").)  He alleges that he suffered impermissible disparate treatment relative to a past trial

4

involving another inmate, who "was allowed to stay in a rather comfortable office with access to counsel and his legal work," while Plaintiff was denied constant access to his legal work. (*Id.* at 5–6.)

Plaintiff's subjective perception of the trial is at odds with the reality in the courtroom. At trial, the Court undertook extensive measures in coordinating with the U.S. Marshals Service, courthouse security staff, and MSP staff to ensure not only that Plaintiff was unshackled in the courtroom, but also that jurors would *never* see him shackled when he was transported in and out of the courtroom during recesses. Plaintiff wore tidy and professional civilian clothing in accordance with the Court's previous order requiring MSP to accommodate his acquisition of such clothing. At trial, the undersigned and courtroom staff stood shoulder-to-shoulder with Plaintiff at sidebar. He was allowed to approach the bench to hand off exhibits, to question witnesses from the podium, and to move freely about the well. At no point did the Court perceive that MSP staff "jumped up" when Plaintiff moved about the courtroom; if anything, their collected, almost dispassionate presence indicated that they, like the Court and its staff, did not view Plaintiff as presenting any kind of danger to anyone in the courtroom.

The nature of the claims in this lawsuit required the jury to learn at some point that Plaintiff is a prisoner, and Plaintiff was aware of that fact. (Doc. 348 at 59.) But, as the Court promised, the jurors never learned why Plaintiff was

imprisoned.  (*Id.*)  Rather, at the outset of the voir dire process, in telling the

prospective jurors "a little bit about what this case is about to assist you in

answering my questions," the Court simply stated, "The plaintiff in this case, Mr.

Richard Shreves – . . . Mr. Shreves is an inmate at the Montana State Prison, and

he has asserted a claim involving an allegation that his constitutional rights have

been violated" and invited Mr. Shreves to introduce himself and his family, who

was present in the courtroom, to the jury.  (*Id.* at 71.)  After asking the prospective

jurors some preliminary questions about whether they knew or researched anything

about the case, the Court stated:

> Now I also want to put your minds at ease.  There is nothing about this
> case, there's nothing about your presence in the courtroom, that need
> - - for you to be concerned at all about your personal security.  Okay?
> So don't, don't be worried about that.  Don't be worried about Mr.
> Shreves.  Don't be worried about any of those sorts of things.  Your
> personal security is not at risk in any way, shape, or form as it relates
> to this case.

(*Id.* at 74.)  The Court then continued voir dire.  (*Id.*)  Plaintiff's contention that the

Court's assurances to the jury that he was *not* dangerous somehow convinced them

that he *was* dangerous is meritless.

As to the issue of office supplies, Plaintiff did not object to that line of

questioning, and the Court can discern no plain error in any failure to sua sponte

strike that testimony.  (Doc. 349 at 300.)  Moreover, on redirect, Plaintiff elicited

that there was no barrier between himself and the office supplies being discussed,

suggesting that there were no safety concerns regarding Plaintiff's access to those supplies.  (*Id.* at 304.)

The only time Plaintiff notified the Court of any issues related to the facilities in which he was being held related to his need to access to his legal supplies and materials shortly before closing arguments, and the Court immediately discussed with MSP staff, who were present in the courtroom, that Plaintiff should be accommodated to allow him access to paper and a writing instrument over the lunch hour to work on his closing argument.  (Doc. 349 at 367–68.)  Plaintiff's belated complaint that he should have been given the same accommodations as a plaintiff in an entirely different case is not a basis to grant a new trial.

## II.    The Court did not abrogate a "duty" to interfere with MSP security protocols or to guarantee particular lunches to Plaintiff.

Plaintiff argues that the Court had a "duty to 'interfere' with security protocols to guarantee a fair trial," citing the Court's previous direction to MSP to provide reasonable accommodations to Plaintiff regarding his requests for appropriate civilian clothing for trial—with which, the Court notes, MSP complied. (Doc. 338 at 4.)  Plaintiff further argues that MSP provided him inadequate lunches "consisting of sandwiches, chips, 4 crakcers [sic], and peanut butter or baloney sandwiches" which were "[n]either sufficient nor nutriotonally [sic] dense" and

which "resulted in the complete deprived state Shreves felt in on the second day of trial[.]"  (*Id.* at 5.)

Plaintiff cites no authority for this purported duty to micromanage state prison employees in the performance of their duties, all the way down to meal-planning, when transporting a prisoner.  The Court intervened where necessary to provide Plaintiff a fair trial, including by requiring that he be unshackled when in the presence of the jury and allowed to obtain civilian clothes to wear during the trial.  However, any trial attorney can relate to Plaintiff's claim of a "deprived state" by the second day of trial; the reality of practicing law is that trying a case is exhausting, and no verdict would ever stand if an attorney's rushed or meager lunch or a bad night of sleep could retroactively call the fairness of the trial into question.  At no point during the trial did Plaintiff indicate that he was not ready to proceed based on his lack of access to materials or his physical condition except when he requested access to his materials to prepare his closing statement over a lunch recess, and the Court immediately ensured that request would be granted. Accordingly, the Court will not grant the motion for a new trial.

## III.   The Court did not act as an advocate or evince partiality.

Plaintiff argues that "the jury only ever saw or heard the judge advocating for Fletcher and correcting, yelling at, and otherwise taking sides against Shreves." (Doc. 338 at 6–7.)  Specifically, Plaintiff argues: (1) during voir dire, the Court

instructed the jury that the standard for punitive damages was higher than the preponderance of the evidence; although the Court acknowledged this error and provided correct final instructions to the jury, the initial error "demonstrated the judge's position on the damages he felt Shreves was entitled to and not the law"; (2) the Court repeatedly "yelled" at Plaintiff during Fletcher's testimony; (3) the Court erroneously allowed defense counsel to use an exhibit to impeach Plaintiff; (4) the Court allowed Fletcher to give unresponsive and long-winded answers to Plaintiff's direct examination, again "yelled" at Plaintiff, "began asking Shreves how long he was questioning Fletcher for.  Was he almost done" [sic], and "talked Shreves into letting Fletcher come down and Shreves could question him later during the Defense's case" but then "sternly warned Shreves he could only cross related to the questions counsel just asked," depriving him of an opportunity to finish his questioning; (5) "because the Court was so busy trying to hurry the trial along[,]" "[f]ollowing an outrage of impatiance [sic] from the Court," Plaintiff decided to release two of his witnesses from subpoenas; (6) the Court asked "pointed" questions of Plaintiff after defense counsel finished cross-examination and "comment[ed] from the Bench" about the nickname "Fishsticks" in a way that "implied that somehow Shreves was now the one being evasive"; (7) and the Court allowed Fletcher and current MSP Warden Salmonsen to testify falsely and then

refused to admit any evidence that would contradict their testimony, which
Plaintiff asserts is a standalone evidentiary error as well.  (Doc. 338 at 6–13.)

Plaintiff is correct that, as the Court was questioning prospective jurors
about prior jury service experiences and providing prospective jurors with a broad
overview of the difference between criminal and civil cases and the differing
burdens of proof in those cases, the Court erroneously stated that punitive damages
require "a heightened burden of proof."  (Doc. 348 at 84, 283.)  Contrary to
Plaintiff's accusation, however, this error—which Plaintiff admits was
acknowledged and corrected—was not evidence of bias, but rather a simple
mistake attributable to the Court's recollection of a recent civil jury trial in which
the Court applied the heightened burden of proof for punitive damages under
Montana law for state-law claims over which the Court was exercising diversity
jurisdiction.  *See* Working Jury Instruction No. P-5, *Rhoten v. Rocking J. Ranch
LLC*, No. CV 21-46-DLC-M, Doc. 82-1 at 5 (D. Mont. Oct. 3, 2022).  In that case,
the parties had jointly proposed an instruction applying an incorrect burden of
proof for punitive damages, and the Court undertook substantial last-minute work
to prepare and provide correct instructions.  The Court's erroneous and later-
corrected statement made in passing during voir dire in this trial was not reflective
of bias against Mr. Shreves or his claims, but rather the recent memory of a
significant issue in the Court's last civil trial.

As to Plaintiff's complaint that defense counsel was allowed to impeach him with Fletcher's answers to interrogatories, Plaintiff did not object to their admission contemporaneously, he noted for the record that the exhibit was Fletcher's answer, and he answered counsel's questions relating to the exhibit. (Doc. 349 at 345–47.)  The Court discerns no plain error in any failure to sua sponte decline to admit the exhibit or strike the subsequent line of questioning.

As to Plaintiff's other accusations, the Court is well aware that a transcript cannot fully convey the tone or demeanor of individuals in the courtroom. However, the Court must staunchly deny Plaintiff's accusations of partiality, bias, and "yelling" at Plaintiff.  Throughout the proceedings, the Court frequently commended Mr. Shreves on his extraordinary understanding of applicable law and rules and litigation skills.  (*E.g.*, Doc. 348 at 37–38 ("[Y]ou have been a strict rule follower in this particular case, and I would concede that sometimes the rules are confusing.  But you seem to understand them better than some lawyers that appear in my court."); Doc. 349 at 383 ("I appreciate the fact that you have diligently researched the law.").)  When Mr. Shreves asked questions about the proceedings, the Court carefully and patiently answered the questions and ensured that Mr. Shreves understood.  (*E.g.*, Doc. 348 at 41–42, 57–58, 106–07; Doc. 349 at 296–97.)  Even when Mr. Shreves repeatedly pushed the boundaries of the Court's previous evidentiary rulings by asking questions about issues ruled inadmissible,

11

the Court's warning to Mr. Shreves, given only after several sustained defense objections, was couched in terms of his intelligence and skill: "Mr. Shreves, you know what the issues are in this case.  You know the parameters.  I expect you to adhere to my orders."  (Doc. 348 at 148.)  The Court made every effort to treat Mr. Shreves with all of the dignity and respect accorded to attorneys who appear before the Court, and to provide him with significantly *more* patience and guidance than any licensed attorney could reasonably expect to receive.

Many of Plaintiff's accusations of judicial bias arise from occurrences during his examination of Fletcher.  The transcript is largely incapable of demonstrating the feverish intensity and hostility of both Plaintiff's questions and Defendant's answers during Defendant's testimony as the questioning wore on. (*But see* Doc. 348 at 225 (sustaining objection to argumentative questioning); *id.* at 241–42 (striking Plaintiff's commentary on Defendant's answer).)  The Court and the court reporter alike were forced to interrupt the questioning multiple times as the parties cut each other off, and, eventually, shouted over each other.  (*E.g.*, *id.* at 150, 157, 178.)  The Court also had to instruct "everybody" to "please be quiet" when Plaintiff interrupted defense counsel and began attempting to argue against an objection while the Court was reviewing the real-time transcript to analyze the objection.  (*Id.* at 227–28.)  To the extent there was any tension and frustration in the courtroom, it was between Plaintiff and Defendant; the Court's infrequent

intervention was not for the purpose of chastising Plaintiff, but rather an effort to maintain order and allow the court reporter to perform her duties.

Plaintiff specifically accuses the Court of "yelling" at him repeatedly during one particular exchange in which Plaintiff "submit[ted]" an exhibit to the Court that he "eventually" wanted to offer as impeachment evidence under a mistaken belief that he "ha[d] to present something to show that I'm not just speculating." (Doc. 348 at 198–202.)  The Court did not understand what Plaintiff was attempting to do, and the following exchange occurred:

> THE COURT: Mr. Shreves, what do you want me to do right now? What are you asking me to do?  Are you asking me to admit Exhibit 4? Yes or no.
>
> MR. SHREVES: At this moment, I –
>
> THE COURT: Or do you want to continue to question this witness and then maybe offer Exhibit 4 at a later point in time?
>
> MR. SHREVES: I mean, I'd like to admit it eventually. I mean –
>
> THE COURT: Okay. Well, then, offer it when you want to admit it.
>
> MR. SHREVES: So, so –
>
> THE COURT: And then I'll ask Mr. Zackheim if he has an objection.
>
> MR. SHREVES: May I, may I, may I approach, Your Honor?
>
> THE COURT: No.  This is very straightforward, Mr. Shreves.  You have a witness on the stand.  If you believe he has given you an answer that you believe is contradicted by an answer that he gave to interrogatories, then all you need to ask me to do is to admit the interrogatory answer, and I will let you endeavor to impeach him.

. . .

THE COURT: Are you offering Exhibit 4?

MR. SHREVES: Not at this moment, Your Honor.

THE COURT: Not at this moment.

MR. SHREVES: I'd, I'd like to eventually.  But the thing is, if I admit it, he's gonna look at it, and I'd like to get the answer before he looks at it.

THE COURT: Okay.  Then ask him the question.  And then once you've got the answer that you want, if you then want to admit this exhibit, offer it.  And I'll elicit a response from Mr. Zackheim, and if he doesn't object, or if he does object and I overrule his objection, then I'll admit this exhibit.

MR. SHREVES: Okay.

THE COURT: You know what to do.

MR. SHREVES: Your Honor, I'm trying to figure it out.

THE COURT: No, you know what to do.

MR. SHREVES: You read a book and you do it in court, it's way – it's two different things.

THE COURT: Yeah, well, you're pretty good at what you're doing.  So ask the question, and then we'll see where we are.

(*Id.* at 199–202.)  Plaintiff resumed questioning Defendant, and he never moved to admit Exhibit 4.  As the Court has already acknowledged, a cold transcript cannot convey tone—or volume.  At no point did the Court "yell" at Mr. Shreves.  To the extent the Court's tone was stern, this exchange should be placed in the context of occurring after the Court had already been forced to admonish the parties for

14

talking over each other, warned Plaintiff to tread more carefully after several attempts to ask Defendant about subjects that had been excluded in pretrial evidentiary rulings, and intervened when Plaintiff repeatedly asked Defendant questions already asked and answered, as discussed elsewhere in this order.  In balancing the need to provide some procedural guidance to a (highly intelligent and legally knowledgeable) pro se litigant with the imperatives to keep the examination moving and avoid wasting the jury's time with Impeachment 101, the Court opted for efficiency—and complimented Plaintiff's performance in the process.  None of this demonstrates prejudicial bias against Plaintiff.

Plaintiff also takes issue with the Court's handling of Plaintiff's testimony, particularly the Court's questioning of Plaintiff following the end of defense counsel's cross-examination.  The Court stated, "I think there are probably a couple of issues that the jury is wondering about" and asked three questions of Plaintiff to clarify that he was not placed in protective custody or removed from participating in prison programs as a result of filing the grievance in question. (Doc. 349 at 347–48.)  Plaintiff did not object, and he was then offered, and accepted, an opportunity to provide a narrative on redirect, during which he merely asserted that he had no record of correction.  (*Id.* at 348–49.)  Additionally, at no point did the Court "comment from the bench" regarding the nickname "Fishsticks"; the Court's best guess as to Plaintiff's meaning behind that

accusation is that he is referring to the Court's ruling overruling Plaintiff's relevance objection to defense counsel's questioning about the origin of that nickname, in which the Court explained "you testified to that, Mr. Shreves." (*Id.* at 342.)  The Court's explanation was simply that Plaintiff had opened the door. There was no commentary on the nickname itself or suggestion that Plaintiff was being evasive.

As to Plaintiff's claim that the Court rushed his case along, Plaintiff himself stated during the final pretrial conference that he anticipated having most of his witnesses' testimony—including Defendant's—done by the end of the first day of trial.  (Doc. 348 at 52.)  Plaintiff spent an inordinate amount of time asking—and re-asking—questions of Defendant regarding photographs of various areas of MSP.  (*E.g.*, *id.* at 171–172.)  Out of the presence of the jury, during a recess in Defendant's examination, the Court explained to Plaintiff that "I don't want you to think I'm singling you out for any particular abuse," but that asked-and-answered questions are a pet peeve that "applies to everybody in my courtroom" because the Court views them "as a waste of time, and I don't want to waste the jury's time." (*Id.* at 172–74.)  Additionally, based on Plaintiff's earlier representation that he anticipated having most of his witnesses' testimony completed by the end of the first trial day, Warden Salmonsen had traveled from Deer Lodge to Missoula to testify that afternoon, so the Court told Plaintiff that his testimony would need to

be completed that day.  (*Id.* at 173.)  Plaintiff resumed questioning Defendant.  (*Id.* at 174.)

To be sure, Defendant sometimes gave long answers, but as the Court explained to Plaintiff in declining Plaintiff's request to instruct Defendant "to just stick to the question itself", "You're asking open ended-questions, and he's answering them."  (*Id.* at 195–96.)  After extended questioning about seemingly tangential issues, and when Plaintiff attempted to introduce an exhibit concerning the inmate grievance program, the Court called Plaintiff's attention to the time of day, his earlier statement that he wished to have his other witnesses testify that afternoon, and the length of the current examination.  (*Id.* at 232–33.)  Plaintiff responded that he did not want "to allow Mr. Fletcher to benefit from the long answers that he's been giving," at which point the Court reminded Plaintiff that he was asking open-ended questions, and Defendant was allowed to provide complete answers.  (*Id.* at 233.)  Plaintiff then represented he did not have many more questions for Defendant and resumed questioning.  (*Id.* at 233–34.)  Plaintiff completed his examination of Defendant and another witness and began examining Warden Salmonsen that afternoon.  And outside the presence of the jury, in discussing expectations for the following day's proceedings, Plaintiff stated that he would likely be his final witness because "Harley Howard is probably not gonna come into it" and that "the other witness, Ms. Stefalo" could be released from her

subpoena because "I think [her testimony] would just be a repetitive matter" regarding various issues already established in the case.  (*Id.* at 280–82.)

The transcript belies Plaintiff's re-imagining of the Court's reminders of time, the parties' proposed schedule, and waiting witnesses and Plaintiff's own decision to release two witnesses from their subpoenas as impatient outbursts and coerced decisions.  Plaintiff extensively questioned Defendant on direct examination, and the Court properly limited Plaintiff's cross-examination of Defendant to the matters testified to during defense counsel's direct examination of Defendant.  Plaintiff cannot now blame the Court for his choices regarding time management during the trial.

Finally, Plaintiff argues that the Court allowed false testimony and "refused to allow any evidence in to contradict" Salmonsen's and Defendant's testimony, arguing specifically that various evidentiary items excluded by pretrial orders should have been admitted because their testimony opened the door to such evidence.  (Doc. 338 at 11–13.)  The Court understands that Plaintiff considers those witnesses' testimony to be false, but he provides no concrete proof of that assertion, and the jury plainly disagreed.  The Court declines to relitigate—yet again—the question whether the excluded evidence cited by Plaintiff is relevant, establishes bias, or is appropriate Rule 404(b) evidence.  (Doc. 348 at 276.) However, the Court notes that Plaintiff was cautioned at the final pretrial

conference: "You do not get to create impeachment through your questioning by raising subjects that I have excluded.  Okay?"  (*Id.* at 48.)  Plaintiff stated that he understood (*id.*), but the Court notes that his argument in the instant motion is based on testimony he elicited from those witnesses.  Plaintiff may raise this issue on appeal; the Court will not revisit it again.

## IV.   Plaintiff's suspicions of juror misconduct are baseless.

Plaintiff accuses a specific juror of misconduct for the following reasons: (1) the juror stated during voir dire that he has a roommate who had spent five years in prison, with whom Plaintiff suspects the juror discussed the case; (2) the jury sent a note to the Court, signed by this juror, asking a question about Plaintiff's use of the formal grievance process, leading Plaintiff to believe that extraneous information was introduced during the jury deliberation process; and (3) the juror "came out of the jury deliberations and deliberately turned toward Mr. Shreves, while at the Plaintiff's table, and stared at him as the verdict was read," which Plaintiff perceived as "very peculiar and concerning because it really came across as confrontational."  (Doc. 338 at 14.)

The Court finds these arguments not only unpersuasive, but appalling.  The accusations against this juror reflect pure speculation and baseless paranoia that the juror not only disregarded the Court's repeated instructions not to discuss the case with anyone, but also harbored some kind of animus toward Plaintiff, also contrary

to the Court's instructions.  "A jury is presumed to follow its instructions." *Weeks*

*v. Angelone*, 528 U.S. 225, 234 (2000).  Moreover, no extraneous information was

necessary for the jury to learn that a formal grievance process existed and to pose a

question about it; Warden Salmonsen testified about the difference between

informal and formal grievances and the general process of resolving them (Doc.

349 at 301–02), and Exhibit 26, which was admitted and to which the jury had

access during deliberations, stated "You have the right to file a Formal Grievance

if this response does not satisfy you" (Doc. 326-4).  The evidence admitted at trial

informed jurors of the existence of a formal grievance process, so the jury's

question to the Court about that process does not indicate that the jury received or

considered extraneous information.

There is no evidence whatsoever that any juror engaged in any kind of

misconduct during this trial.

## V.     The verdict was not contrary to the clear weight of the evidence.

Plaintiff argues that the jury's verdict "contradicts the information received

at trial in that Fletcher admitted in vague terms that he did threaten Shreves with

loss of privileges[,]" and "[f]inding that this action was not fulfilled on the

[verdict] form demonstrates that the exchange between Shreves and the Court

influenced [the jury's] ability to discern what evidence had actually been

received."  (Doc. 338 at 15.)  The Court disagrees.

As discussed above, on a motion for a new trial, the Court may weigh the evidence and assess the credibility of the witnesses.  Ample evidence in the record supports the jury's verdict.  The ultimate question in this case is what happened during the September meeting between Plaintiff and Defendant.  Plaintiff, Defendant, and Warden Salmonsen testified regarding their recollection of those events, and the jury was tasked with weighing the witnesses' credibility and resolving any factual disputes.  The jury was entitled to find Defendant and Warden Salmonsen's version of events more credible than Plaintiff's.  The Court's view of the evidence is perhaps best summarized by this question and answer during Plaintiff's direct examination of Defendant:

> Q      When you read, "I was fairly concerned at this point," you responded, "Yes or no, do you need [protective] custody?" to Mr. Shreves.  Correct, Mr. Fletcher?
>
> A      I think it's a little disjointed and not accurate, the way our conversation went.

(Doc. 348 at 212.)

Defendant and Warden Salmonsen consistently testified that the September meeting was to address Plaintiff's informal grievance and some other issues with his behavior.  (*Id.* at 197–98, 258.)  Defendant did not recall Defendant telling Plaintiff that he was "too productive in prison" (*id.* at 202–03), or that he was "out of touch with reality" or that he "lived in an alternative universe" (*id.* at 210, 262); neither Defendant nor Salmonsen recalled Defendant forcing Plaintiff to say "I'm

an inmate" or "I'm not special" (*id.* at 223, 265); and Defendant did not recall himself being "worked up" (*id.* at 208).  Defendant did not recall asking Plaintiff whether he was smirking or whether he thought the situation was funny, telling Plaintiff that he could take Plaintiff's positions as a program facilitator and employee, or telling Plaintiff that he did not have a vendetta against Plaintiff, but acknowledged he may have done so.  (*Id.* at 220, 226–27, 228.)  Defendant did recall telling Plaintiff that he did not have additional privileges over other inmates (*id.* at 203–04); discussing a prior incident of Plaintiff eating staff food and characterizing it as a pattern of taking advantage of staff and his position as a program facilitator (*id.* at 206–08); asking Plaintiff whether he needed protective custody, which Defendant explained was something he "always go[es] over" whenever he talks to an inmate to discuss their safety and was not related to the discussion of Plaintiff's grievance (*id.* at 212–15); and he recalled that Plaintiff began to cry and told him that the reason he was crying was that "at a previous facility he had been sprayed with hot water," at which point Defendant recommended counseling (*id.* at 216).

Plaintiff's narrative testimony, by contrast, was rife with Plaintiff's admitted suspicion of Defendant, his belief that their relationship was bad from their first meeting, and his intense focus on any perceived slight against him.  To be sure, another witness testified that Defendant was "a little bit unprofessional and rude"

in his interaction with Plaintiff during a class Plaintiff was facilitating.  (*Id.* at 247.)
And a contemporaneous email admitted in evidence indicates that Salmonsen
stated that although Defendant was professional in the September meeting,
Salmonsen would have handled Plaintiff's grievance differently than Defendant
did, by sending a written response rather than meeting with Plaintiff.  (Doc. 326-5.)
Could the jury have viewed Defendant's demeanor while testifying as somewhat
arrogant, and his portrayal of himself as a level-headed, by-the-book warden not
entirely credible?  Arguably yes.  However, the jury could also have viewed the
Plaintiff, through his testimony, as being self-centered and paranoid, which
lessened his credibility as an objective observer of Defendant's conduct during the
September meeting.

For example, when Plaintiff saw Defendant walking across a sidewalk and
reading a piece of paper, Plaintiff recalled "thinking to myself, 'That's got to be
my Informal.'"  (Doc. 349 at 323.)  When Defendant asked him whether he needed
protective custody, Plaintiff "thought I was going to the hole right there.  I thought,
'This is it.  I'm gonna get locked up.'"  (*Id.* at 325.)  When explaining that the
meeting ended because he was called for physical therapy, he remarked, "who
knows if I didn't get the call" in a manner that suggested something worse could
have happened to him.  (*Id.* at 335.)  He testified that during a later meeting with
Defendant, he had a pen in his hand and remembered "deliberately putting it in my

pocket so that he wouldn't say I had a pen and tried to get crazy with him." (*Id.* at 336.)  He believed that Defendant was aggravated about the grievance "because it was mine." (*Id.* at 344.)  He believed that Defendant had a "vendetta" against him because he had been made a program facilitator, which he claimed turned him into a "trophy buck" because he believed "sometimes staff just really get joy out of taking down the people they think are doing a little too good." (*Id.* at 344.)  Any finder of fact could have reasonably concluded that Plaintiff's perception and recollections of the September meeting reflected Plaintiff's paranoia and extraordinary sensitivity, not Defendant's objective actions, and declined to credit his testimony.  Both Defendant and Warden Salmonsen provided testimony sufficient to support a finding that Plaintiff was not threatened with loss of privileges, explicitly or implicitly, and the jury was entitled—and, in the Court's view, correct—to credit that testimony and reach the verdict it did.  The verdict was not contrary to the clear weight of the evidence.

## VI.    The Court did not err in declining to give Plaintiff's proposed final instruction regarding threats.

Plaintiff argues that the Court's decision not to give his Proposed Final Instruction No. 12 (Doc. 308 at 20), which stated that a mere threat of harm can constitute an adverse action, led the jury to misapply the law in finding that Fletcher did not take adverse action against Plaintiff.  (Doc. 338 at 15–16.)  He

24

contends that because the Court failed to give his proposed instruction, the jury

"had no formal instruction that Threats constitute adverse action" and lacked

"needed guidance for Jurors to determine what exactly adverse action is." (*Id.*)

The final instruction given to the jury on this issue stated in relevant part that

Plaintiff must prove that "Mr. Fletcher took an adverse action against Mr. Shreves

during the September meeting in Mr. Salmonsen's office by threatening Mr.

Shreves implicitly or explicitly with loss of privileges." (Doc. 329 at 18.) The text

of the instruction Plaintiff proposed states:

> An adverse action need not amount to an independent constitutional violation. The mere threat of harm can be an adverse action, regardless of whether it is carried out because the threat itself can have a chilling effect. By its very nature, a statement that "warns" a person to stop doing something carries the implication of some consequence of a failure to heed that warning.

> Mr. Shreves need not establish that Mr. Fletcher's statements contained explicit, specific threats of adverse action if Mr. Shreves failed to comply. Statements by Mr. Fletcher intimating that some form of punishment or adverse regulatory action would follow a failure to comply are sufficient to constitute adverse action. The power of a threat lies not in any negative actions eventually taken, but in the apprehension it creates in the recipient of the threat.

(Doc. 308 at 20.) At trial, when settling the proposed final jury instructions, the

Court modified Final Instruction No. 12 in response to Plaintiff's objection to add

the language "by threatening Mr. Shreves implicitly or explicitly with loss of

privileges." (Doc. 349 at 372–74.) Although Plaintiff approved that modification,

he suggested adding "or adverse regulatory action" after "loss of privileges." (*Id.*

at 374.)  Both Defendant and the Court found that additional language confusing, and the Court declined to add that language, but the Court made clear to Plaintiff that he was not precluded from arguing to the jury the distinction he drew between regulatory action and loss of privileges.  (*Id.* at 374–76.)  Plaintiff did not have any further objections to this aspect of the instruction.

Plaintiff arguably waived the argument he now raises that the jury should have been given a much longer instruction regarding adverse actions and threats. But even if he had not, regardless of the standard of review the Court applies, the Court finds no error in declining to give his requested instruction.  The final instruction and the verdict form made clear—as did the evidence at trial and the parties' closing arguments—that the adverse action at issue was Defendant's alleged threats to Plaintiff during the September 6 meeting, regardless whether such threats were explicit or implicit.  To the extent Plaintiff's proposed instruction restated those agreed-upon principles, it was unnecessary.  The remainder of his proposed instruction merely provided a common-sense explanation of what a threat is and why it can cause harm.  While such explanation clarified the reasoning behind the court's conclusion in the Ninth Circuit case Plaintiff relied upon for that language, it was not necessary to explain to the jury a concept that even misbehaving young children can understand: that warnings or threats cause apprehension in their recipients.  And Plaintiff's testimony regarding his internal

and external responses to Defendant's statements during the September meeting made it abundantly clear that the harm he suffered was fear of being sent to the hole and losing many of the privileges he had worked quite hard for.  The concept of a threat and the fact that a threat can cause harm did not require further explanation.

CONCLUSION

IT IS ORDERED that the motion (Doc. 337) is DENIED.

DATED this 17th day of April, 2023.

Dana L. Christensen, District Judge
United States District Court